# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

IN THE MATTER OF THE SEARCH OF RECORDS AND )
INFORMATION ASSOCIATED WITH A CELLULAR )
TELEPHONE ACCOUNT THAT IS STORED AT )
PREMISES CONROLLED BY VERIZON )
)

Case No. **17-M-1278**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 666(a)(1)(A)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Scott G. Schuster_
*Applicant's signature*

Special Agent Scott G. Schuster, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _5/19/17_

_William E. Duffin_
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

## IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF
RECORDS AND INFORMATION
ASSOCIATED WITH A CELLULAR
TELEPHONE ACCOUNT THAT IS
STORED AT PREMISES CONTROLLED
BY VERIZON

Case No. _____

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Scott G. Schuster, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain account that is stored at premises owned, maintained,

controlled, or operated by Verizon, a wireless provider headquartered at 180 Washington Valley

Road, Bedminster, New Jersey. The information to be searched is described in the following

paragraphs and in Attachment A. This affidavit is made in support of an application for a search

warrant to require Verizon to disclose to the government records and other information in its

possession pertaining to the subscriber or customer associated with the account, including the

contents of communications.

2.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge regarding this matter.

3.    I have been a Special Agent with the FBI since September 1996. I am currently assigned to the White Collar Crime squad. My current responsibilities include investigating public corruption and other fraudulent criminal activities. I have gained experience in the conduct of such investigations through formal and informal training, and in consultation with other members of the law enforcement community regarding these matters.

4.    This affidavit is based upon my personal knowledge and upon information reported to me by other federal law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.    This affidavit is also based upon information gained from interviews with cooperating citizen witnesses and informants whose reliability is established separately herein.

5.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

6.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, §§ 666(a)(1)(A), 1343, and 1346 have been committed, are being committed, and will be committed by WILLE WADE, who has utilized cellular telephone number 414-491-9021, and KHALIF RAINEY, who has utilized cellular telephone number 414-233-4170. There is also probable cause to search the records and information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

2

## PROBABLE CAUSE

7.     On April 13, 2017, a Confidential Human Source (CHS) who has provided reliable information in the past, informed case agents that CHS was contacted by a business associate about an upcoming license application before the City of Milwaukee License Committee. The business associate stated that he had met with WILLIE WADE and they discussed the license. WADE is a former City of Milwaukee Alderman who is currently employed as the Vice President of the Milwaukee Area Workforce Investment Board. WADE told the business associate that WADE could secure votes from certain City of Milwaukee Common Council members in support of the license application. The business associate told CHS that WADE wanted to get paid for securing votes. One of the Common Council members identified by WADE was City of Milwaukee Alderman KHALIF RAINEY. RAINEY is the 7th District Alderman for the City of Milwaukee. RAINEY was elected in April 2016 to that position which was formerly held by WADE.

8.     For several reasons, case agents believe that CHS is reliable and credible. First, CHS has been providing continuous information since March of 2015. Second, the information CHS has provided is substantially against CHS' personal financial interest. Third, CHS was arrested in March of 2015 pursuant to a money laundering investigation and is cooperating for consideration on that charge. CHS has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, and other witness and law enforcement reporting. Finally, CHS has had an opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CHS to be reliable.

3

9. On Thursday, April 13, 2017, CHS sent a text to (414) 491-9021 (Target Telephone #1) stating that CHS had heard that WADE had met with the business associate. CHS asked in the text if WADE was available to meet sometime during the next several days. WADE responded to CHS with a text from the Target Telephone #1 and arranged to meet the next day (April 14, 2017) at a business establishment in the City of Milwaukee.

10. On Friday, April 14, 2017, acting under the direction and control of case agents, CHS met with WADE at the business establishment. CHS was provided with a recording device furnished by the case agents. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recordings. Case agents confirmed the following discussions from the recordings:

      a. WADE acknowledged that he had met with the previously mentioned business associate. WADE asked CHS what CHS needed from WADE. CHS explained that CHS needed RAINEY to vote in favor of the CHS' license application which was to be considered at a Licenses Committee hearing scheduled on April 17, 2017, and during the full City of Milwaukee Common Council meeting the following day. CHS stated that CHS was willing to do whatever it takes to secure RAINEY's affirmative votes. WADE advised that he could not guarantee anything but he felt confident that he could persuade RAINEY to vote in favor of the license application. WADE stated that he would not talk to RAINEY over the telephone about this matter but would meet with him on Sunday (April 16, 2017).

      b. WADE asked CHS what CHS meant by saying CHS would do whatever it takes to garner RAINEY's vote. WADE asked CHS to give him some

4

numbers because CHS would know better than WADE how much the license was worth to CHS. WADE stated that RAINEY is going to want the payment to be "layered." WADE advised that he trained RAINEY himself. WADE stated that whatever RAINEY gets, it has to be "layered" somehow.

c. CHS and WADE discussed an amount that seemed reasonable for RAINEY and decided upon $10,000. WADE then negotiated his own fee ($5,000) for obtaining RAINEY's votes for CHS. WADE and CHS discussed how the payment should be made and tentatively decided that CHS should pay half to WADE prior to the Licenses Committee hearing. WADE assured CHS that WADE would return the money if RAINEY failed to vote in favor of the license application. WADE then confirmed the agreement by stating the following: "ten for RAINEY, five for me (WADE), fifteen total, done deal". WADE and CHS then shook hands to formalize their agreement. WADE stated he would call CHS sometime Sunday evening (April 16, 2017) to let CHS know if RAINEY was on board. If so, CHS was to provide WADE half the money by Monday morning before the hearing.

11. Later that day, WADE contacted CHS and arrangements were made to meet again at a business location in a suburban area in the vicinity of Milwaukee. Acting under the direction and control of case agents, CHS utilized a recording device to meet with WADE. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions from the recording:

a. WADE provided CHS with a slip of paper and told CHS that it contained the "conditions." The slip of paper read as follows "20K cash by midnight

5

Sunday night." CHS later provided case agents with the slip of paper from WADE.

b. WADE told CHS that he met with RAINEY and RAINEY wanted the entire amount up front because he does not trust CHS. WADE explained that the $20,000 figure included WADE's $5,000 fee. CHS expressed reluctance to pay RAINEY up front when RAINEY could just end up voting against the license application. WADE insisted that if RAINEY voted against supporting the license WADE would return CHS' money. CHS advised that CHS wanted to meet face to face with RAINEY to confirm these arrangements. WADE stated that RAINEY would not meet with CHS because RAINEY is an elected official. WADE advised that both CHS and RAINEY are going to have to trust WADE that these arrangements will work out for both of them. WADE told CHS that CHS has a few days to think about it and they could meet again on Sunday.

12. On Sunday, April 16, 2017, CHS met with WADE on two separate occasions to discuss the proposed payment for votes scheme involving RAINEY. The first meeting occurred in the parking lot of a business establishment in the City of Milwaukee. The meeting was not recorded due to operator error activating the recording device. The meeting lasted approximately twenty minutes. CHS was later debriefed by case agents regarding the meeting with WADE.

a. CHS advised that CHS jumped in a vehicle being driven by WADE and they drove around the immediate area of CHS' parked vehicle. CHS continued to insist that CHS needed to meet with RAINEY in person to discuss the proposed payment.

6

WADE stated that RAINEY does not trust CHS and therefore will not meet with CHS. WADE stated the payment is $20,000 up front or RAINEY will abstain from voting the next day at the Licenses Committee hearing. Neither CHS nor WADE would concede their conditions, and the meeting was concluded.

13.     Later that same day (April 16, 2017), CHS and WADE met for a second time at a parking lot of a different City of Milwaukee business establishment. Acting under the direction and control of case agents, CHS utilized a recording device during the meeting with WADE. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions contained on the recording:

   a. WADE explained that WADE wrote the note that he handed to CHS the other day (April 14, 2017) but that it reflected RAINEY's expectations regarding the payment. CHS reiterated that CHS needed to meet face to face with RAINEY before releasing the money to WADE. WADE stated that WADE was a public official for thirteen years and he knows that RAINEY will not meet with CHS to discuss this matter. WADE explained that RAINEY is new at this and RAINEY does not trust CHS. WADE predicted that RAINEY would likely abstain rather than vote at the License Committee hearing if CHS does not pay the money.

14.     Based on my subsequent review of toll records and text messages for Wade's cellular telephone (Target Telephone #1), which were received from Verizon pursuant to an earlier search warrant, I know that, immediately after the conclusion of his meeting with CHS, WADE sent a text message to RAINEY's cellular telephone (Target Telephone #2), which asked RAINEY to "Call me ASAP please."

7

15.     On Monday, April 17, 2017, CHS arranged to meet with WADE at a location in a suburban area in the vicinity of Milwaukee. Acting under the direction and control of case agents, CHS utilized a recording device during the meeting with WADE. Surveillance units observed WADE entering the vehicle of CHS and departing the meet location in CHS' vehicle. CHS and WADE eventually returned to the original meeting location and WADE departed in his own vehicle. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions contained on the recording:

a.  CHS informed WADE that CHS had $10,000 with him to pay towards their agreement that RAINEY will vote to recommend approval of the license application. CHS asked WADE to call RAINEY and have RAINEY tell CHS that RAINEY will vote yes for CHS' license application. WADE refused, alleging that WADE's cell phone was being wiretapped. WADE assured CHS that CHS had nothing to worry about. WADE also repeated that RAINEY needed the money to be "layered." CHS argued that WADE needed to call RAINEY anyway to report that WADE had received the money so why couldn't CHS listen to the conversation. WADE advised that WADE was to send RAINEY a code once WADE received the money.

b.  WADE advised that once WADE received the money, WADE would go into his car, send a text to RAINEY with the code, and then the deal would be complete. WADE again refused to call RAINEY to let CHS talk to RAINEY directly and, without agreeing to the terms of the transaction, WADE exited the vehicle without receiving any money from CHS.

8

16.     As CHS was driving away, WADE called CHS from WADE's cellular telephone (Target Telephone #1) and asked CHS to come back.

      a.  WADE returned to CHS' vehicle and offered another proposal. WADE offered to accept half of the $20,000 today and collect the remaining amount on Wednesday (April 19, 2017) after RAINEY had completed voting in both the License Committee hearing and the Common Council session. WADE stated he would not tell RAINEY that WADE had only collected half of the money from CHS. WADE showed CHS his cellular telephone call log history. WADE pointed out to CHS that at 11:28 am (CST) CHS called WADE. At 11:52 am (CST), WADE called RAINEY but did not speak to him. At 12:18 pm (CST), WADE received an incoming call from RAINEY and they talked for three minutes. WADE said to CHS, "What the fuck do you think I was talking to him about?"

      b.  In a subsequent review of toll records for the Target Telephone #1, I confirmed that WADE made a 33 second telephone call to (414) 233-4170, at 11:52 am (CST), on Monday April 17, 2017. Approximately 30 minutes later, WADE received a three minute and 24 second telephone call from the same number, at 12:18 pm (CST), on Monday April 17, 2017. Based on his prior communications with CHS, I understand that (414) 233-4170 (Target Telephone #2) is the telephone number that is regularly utilized by RAINEY.

      c.  According to WADE, during that three-minute telephone conversation, RAINEY told WADE that he was planning to abstain from voting at the License Committee hearing. WADE told RAINEY that he (WADE) would talk to CHS one more time

9

and send the code to RAINEY if an agreement was reached with CHS. CHS stated that if WADE allowed CHS to see him sending the code to RAINEY, they had a deal and CHS would give WADE the $10,000 that CHS had brought with him in the vehicle. WADE then typed the following text message to RAINEY, which WADE read out loud as he was typing: "we good with the home team." CHS repeated the phrase as well. WADE then sent the text to RAINEY.

d. Based on my review of text message records for WADE's cellular telephone (Target Telephone #1), which were received pursuant to an earlier search warrant for Verizon information, I understand that a message stating "We all good with the home team" was sent from WADE's cellular telephone (Target Telephone #1) to RAINEY's cellular telephone (Target Telephone #2), at approximately 1:07 pm (CST), on Monday, April 17, 2017.

e. After the text to RAINEY was sent, CHS removed the cash from an envelope and both CHS and WADE began counting out the $10,000. As they were counting the money, CHS asked WADE how much WADE was getting for his services. WADE responded, "Five." After the money was counted, WADE asked if they were meeting again on Wednesday (April 19, 2017) because RAINEY was going to ask WADE about the money. CHS confirmed that they would meet on Wednesday for the additional $10,000 payment. WADE then placed the $10,000 in the pockets of his jacket and shook hands with CHS.

17. On Monday, April 17, 2017, the Licenses Committee conducted its hearing regarding the license application referenced herein. At the conclusion of the three hour meeting,

10

the Licenses Committee voted to hold the matter over for further review and testimony at another Licenses Committee hearing, rather than vote at that point to recommend in favor or against the license application. RAINEY voted in favor of the motion to hold the matter over for another hearing and, as such, CHS' pending license application remained unaddressed by the Licenses Committee.

18.     After the hearing concluded, CHS sent a text message to WADE's cellular telephone (Target Telephone #1) asking for a meeting later that evening. WADE, however, was unable to meet with CHS until the next day.

19.     On Tuesday, April 18, 2017, CHS sent a text message to WADE's cellular telephone (Target Telephone #1) in order to confirm a time and place for a meeting for later that morning. CHS also instructed WADE to "Please bring the paperwork" to their planned meeting.

20.     Shortly thereafter, also on Tuesday, April 18, 2017, CHS met with WADE at a parking lot of a City of Milwaukee business establishment. Acting under the direction and control of case agents, CHS utilized a recording device during the meeting with WADE. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions contained on the recording:

   a. As he had previously promised to do if RAINEY failed to vote in favor of CHS' license application, WADE returned the envelope of $10,000 to CHS and said, "Here's your loot, every penny."

   b. WADE explained that he did not have time to talk right then because he needed to get back to a meeting. WADE told CHS that RAINEY had told him that the Licenses Committee hearing had gotten "crazy." WADE told CHS that he did not

11

exactly know what had happened but wanted to meet again with CHS later in order to get CHS' take on how the hearing had gone down.

c. WADE told CHS that in the future they could not discuss these matters over the telephone. WADE explained that he always knew that his phone was being "tapped," when he was a City of Milwaukee Alderman. WADE joked that he would rather see CHS in person anyway.

21. On Friday, April 21, 2017, CHS met with WADE at a business establishment located within the City of Milwaukee. Acting under the direction and control of case agents, CHS utilized a recording device during the meeting with WADE. Surveillance units observed WADE entering the vehicle of CHS and departing the meet location in CHS' vehicle. CHS and WADE eventually returned to the original meeting location and WADE departed in his own vehicle. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions contained on the recording:

a. WADE told CHS that RAINEY had told WADE that when the Licenses Committee meeting had gotten out of control, RAINEY no longer felt comfortable being the person to vote 'yes' for the motion to recommend approval of the license application. WADE explained to CHS that RAINEY was just inexperienced. WADE told CHS that RAINEY intended to vote 'yes' at the next meeting.

b. CHS told WADE that CHS wanted to speak with RAINEY before the next Licenses Committee meeting but WADE explained that RAINEY would never agree to speak with CHS. CHS then suggested to WADE that CHS and RAINEY could meet at a neutral place in Chicago but WADE explained that he was 99% certain RAINEY would not agree to meet with CHS. WADE told CHS that he was

12

not sure what CHS wanted RAINEY to say because the issue at the Licenses

Committee Meeting was not RAINEY's fault. WADE told CHS that he would ask

RAINEY about communicating directly with CHS but he thought it would be

fruitless.

22.     On Tuesday, May 2, 2017, CHS participated in a consensually recorded telephone

conversation with WADE. Given that the Licenses Committee had scheduled another hearing to

consider CHS' license application for Monday, May 8, 2017, CHS and WADE made tentative

plans to meet and discuss the license application over a late dinner on Saturday, May 6, 2017. For

family-related reasons, WADE cancelled the Saturday night dinner plans and re-scheduled his

meeting with CHS for the afternoon of Sunday, May 7, 2017.

23.     On Sunday, May 7, 2017, CHS met with WADE at a business establishment

located within the City of Milwaukee. Acting under the direction and control of agents, CHS

utilized a recording device during the meeting with WADE. Upon the conclusion of the meeting,

case agents retrieved the recording equipment and reviewed the recordings. Case agents

confirmed the following discussions from the recordings:

      a.  WADE told CHS that he had talked with RAINEY twice on Saturday, May 6,

          2017, in order to ensure that "no bullshit" was going on in terms of the upcoming

          Licenses Committee meeting to address CHS' license application. WADE showed

          CHS the calling history on WADE's cellular telephone (Target Telephone #1) in

          order to demonstrate that WADE had in fact been in contact with RAINEY.

          WADE added that RAINEY had also come over to WADE's home, at WADE's

          recommendation, in order to fully discuss the matter. WADE assured CHS that

13

based on his conversation with RAINEY, the CHS and his license application were "good" for tomorrow.

b. After expressing concern about whether or not WADE was just "free-rolling" and not actually speaking with RAINEY about CHS' license application, CHS asked to listen to a conversation between WADE and RAINEY in which RAINEY states that he intends to support CHS' license application. After protesting about CHS' lack of trust in his friends, WADE reluctantly put his cellular telephone (Target Telephone #1) on speaker and placed a call to RAINEY. When RAINEY answered the telephone call, WADE did not tell him that CHS was also present listening to the conversation. While CHS listened in to the telephone conversation, WADE asked RAINEY if he was ready for the next day and RAINEY responded that he had begun to have second thoughts. RAINEY told WADE that he would call him back later, when he was finished at the gym.

c. Based on my review of toll records for WADE's cellular telephone (Target Telephone #1) and RAINEY's cellular telephone (Target Telephone #2), I know that WADE made two brief telephone calls to RAINEY, at approximately 2:16 pm (CST) and 2:17 pm (CST), on Sunday, May 7, 2017, while WADE was meeting with CHS.

d. Given RAINEY's apprehension, CHS complained that WADE had over-represented to CHS that RAINEY's support was 99.9% certain, when it sounded like RAINEY's support was only about 50% certain. WADE countered by explaining that RAINEY's anxiety was just evidence that WADE had a lot of work to do for CHS. While WADE re-iterated to CHS that he was not worried about

14

RAINEY, WADE agreed to contact CHS later in the day, when he had talked with RAINEY and secured his vote. WADE told CHS to look him in the eyes and then WADE exclaimed, "You got Khalif!"

e. WADE and CHS agreed on a total payment of $30,000 for RAINEY's vote to support the approval of CHS' license application. As with the payment that had been made and refunded in April, WADE told CHS that CHS needed to give WADE half of the payment beforehand and the other half of the payment after the vote was done.

f. Later that evening, WADE and CHS exchanged text messages to see where things stood. CHS asked WADE, "Were you able to get everything straightened out?" and WADE responded, "Yep." CHS and WADE then made plans to meet again the next morning in order to exchange the partial bribe payment.

24. On Monday, May 8, 2017, CHS met with WADE at a parking lot of a City of Milwaukee business establishment. Acting under the direction and control of case agents, CHS utilized a recording device during the meeting with WADE. Surveillance units observed WADE entering the vehicle of CHS and departing the meet location in CHS' vehicle. CHS and WADE eventually returned to the original meeting location and WADE departed in his own vehicle. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions contained on the recording:

a. CHS told WADE that CHS needed to hear RAINEY say that RAINEY was ready to vote in favor of CHS's license application at the Licenses Committee hearing scheduled for later that day. WADE agreed to again allow CHS to surreptitiously listen to a telephone conversation between WADE and RAINEY. After several

15

unsuccessful attempts to reach RAINEY by telephone and by text message, RAINEY finally returned WADE's telephone call. CHS silently listened as WADE spoke with RAINEY on speaker phone and asked RAINEY if "we all good?" CHS heard RAINEY respond by saying that it was understood and nothing further needed to be said. After the call with RAINEY was terminated, WADE stated to CHS, "There you go – it's understood, don't nothing need to be said."

b. With that confirmation, CHS removed an envelope containing $15,000 and began counting the bribe payment that was being made to WADE. Rather than counting the money at that moment, WADE told CHS that he would count it later. WADE asked CHS how much money was included in the envelope and CHS explained that the payment contained $15,000. WADE responded "And another 15 Tuesday and we good." After shaking hands with CHS, WADE took the envelope containing $15,000 and placed it inside his jacket.

c. Based on my review of toll records for WADE's cellular telephone (Target Telephone #1) and RAINEY's cellular telephone (Target Telephone #2), I understand that WADE placed three outgoing telephone calls to RAINEY (Target Telephone #2), at approximately 10:50 am (CST), 10:51 am (CST), and 10:52 am (CST), on Monday, May 8, 2017, while WADE was meeting with CHS. Furthermore, I understand that WADE also sent two text messages to RAINEY (Target Telephone #2), at approximately 10:52 am (CST) and 10:53 am (CST), on Monday, May 8, 2017. Finally, as a result of my review of toll record analysis, I also understand that WADE (Target Telephone #1) received a brief telephone call

16

from RAINEY (Target Telephone #2) at approximately 10:55 am CST, on Monday, May 8, 2017.

25.    Shortly after WADE and CHS' meeting, the Licenses Committee conducted a follow-up hearing regarding CHS' license application. Despite RAINEY's vote of support to recommend approval of the referenced license application, the motion ultimately failed with a full committee vote of two in favor (aye), two against (no), and one abstention. Another motion was made to recommend denial of the referenced license application to the City of Milwaukee Common Council. The committee member who made the motion to recommend denial indicated that he was only making the motion in order to force the matter out of committee and on to the entire City of Milwaukee Common Council. This particular committee member further indicated that he actually intended to vote in favor of approving the license application at the time of the City of Milwaukee Common Council's vote. Consistent with his initial vote of support for the motion to recommend approval of CHS' license application, RAINEY now voted against the motion recommending denial of the license application. The Licenses Committee ultimately voted 3-2 in favor of the motion to recommend that the Milwaukee Common Council deny approval of the license application. As expected, the matter was returned to the City of Milwaukee Common Council, which was scheduled to meet the next day (Tuesday, May 9, 2017), for their further consideration of the Licenses Committee's recommendation.

26.    On Tuesday, May 9, 2017, the City of Milwaukee Common Council convened a regularly scheduled meeting of the entire Common Council, which included all 15 council members. Despite the prior day's recommendation from the Licenses Committee to deny the referenced license application, a motion was made by a member of the Common Council to approve the CHS' license application. RAINEY voted to approve of the referenced license

17

application. With RAINEY's support, the motion prevailed with a vote of 10 in favor (aye) and 5 against (no).

27.     Later that day, CHS met again with WADE at a parking lot of a City of Milwaukee business establishment. Acting under the direction and control of case agents, CHS utilized a recording device during the meeting with WADE. Surveillance units observed WADE entering the vehicle of CHS and departing the meet location in CHS' vehicle. CHS and WADE eventually returned to the original meeting location and WADE departed in his own vehicle. Upon the conclusion of the meeting, case agents retrieved the recording equipment and reviewed the recording. Case agents confirmed the following discussions contained on the recording:

　　　　　a. WADE and CHS discussed the City of Milwaukee Common Council meeting that had taken place earlier in the day, which included the vote of approval for CHS' license application. WADE noted that he was pleased that RAINEY had not talked at all during the Common Council meeting. CHS and WADE joked that WADE should tell RAINEY that CHS wanted a refund because the Common Council's vote of 10-5 had essentially made RAINEY's vote unnecessary.

　　　　　b. When the money was counted, CHS handed the envelope containing $15,000 to WADE, who placed it in his jacket. WADE told CHS that it was nice doing business with him. Before departing the vehicle, WADE stated that, going forward, RAINEY would act like none of this ever happened because that was how you had to act.

28.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages

18

for Verizon subscribers, may be located on the computers of Verizon. Further, I am aware that computers located at Verizon contain information and other stored electronic communications belonging to unrelated third parties.

29. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon for weeks or months.

30. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I know that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, are stored by Verizon for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

31. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have

19

information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

32. Wireless providers may also retain text-messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

33. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

34. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the

20

length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

35.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

36.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to

21

account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

37.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

22

## CONCLUSION

38. Based on the information above, I submit that probable cause exists to believe that possible violations of Title 18, United States Code, Section 666(a)(1)(A), soliciting payments for participation in a bribery scheme of a public official, and Title 18, United States Code, Sections 1343 and 1346, honest services fraud, have been committed, are being committed, and will continue to be committed by WILLIE WADE and KHALIF RAINEY. I further submit that probable cause exists to believe that obtaining the records and other information in the possession of Verizon pertaining to the subscriber or customer associated with the accounts, including the contents of communications, will assist case agents in determining other co-conspirators.

39. Based on the forgoing, I request that the Court issue the proposed search warrant.

40. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

41. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

23

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with 414-491-9021 that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

## ATTACHMENT B

### Particular Things to be Seized

#### I. Information to be disclosed by Verizon

For the time range of May 1, 2017, to the present, to the extent that the information described in Attachment A is within the possession, custody, or control of Verizon, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b. All existing printouts from original storage of the text messages described above;

c. All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from the most recent activation to present;

d. All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

e. All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names,

addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f. Detailed billing records, showing all billable calls including outgoing digits;

g. All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number);

h. Incoming and outgoing telephone numbers;

. i. All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j. All records pertaining to communications between Verizon and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 666(a)(1)(A), 1343, and 1346.

2

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Verizon, and my official title is _____. I am a custodian of records for Verizon. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Verizon, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Verizon; and

    c.    such records were made by Verizon as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____

Date                Signature